UNA S. STEVRALIA, Plaintiff, *v.* PHILIP F. STEVRALIA, SR., et al., Defendants.

UNA S. STEVRALIA, Plaintiff, *v.* PHILIP F. STEVRALIA, SR., Defendant.

Supreme Court, Special Term, Kings County, February 7, 1944.

*Louis F. Huttenlocher* for plaintiff.

*James H. Tully* for defendants.

WALSH, J. Una S. Stevralia instituted an action against her husband, Philip F. Stevralia, Sr., and Genevieve O. Edlund, also known as Genevieve O. Stevralia, alleging that she and the male defendant have been husband and wife since 1917, that the defendants were married in 1943, and demanding judgment that the marriage between the defendants be annulled and declared void. Una S. Stevralia instituted the second action against her husband alone for a separation on the ground of abandonment and of neglect and refusal to provide. (Civ. Prac. Act, § 1161.) The husband denied the abandonment and the failure to provide.

The answer in both actions alleges as a complete defense that the husband, Philip F. Stevralia, became domiciled as a resident of the State of Nevada in June, 1943, and that in September, 1943, he was granted a divorce from the plaintiff in the Second Judicial District Court of Nevada.

The trial required almost three days. Both attorneys submitted memoranda on facts and law, and the court has reviewed the minutes.

The husband endeavored to show that about 1924 the plaintiff left him; about 1926 they agreed to live together until their two

children were of age, after which they would go their separate ways; since then they have not cohabited; the two boys are now more than twenty-one years of age; plaintiff would not keep the agreement, and there was nothing left for him to do but to go to Reno.

Plaintiff denies that any such agreement was made and testified that she and her husband had normal marital relations until March or April, 1943. As to cohabitation, one of these parties committed perjury.

The facts, at best, present a very vague and indefinite parol arrangement to which this court cannot give any legal significance. It was at most an oral agreement to separate eighteen years in the future without any terms.

" An agreement between a husband and his wife, which has for its object their future separation, is of no legal force or effect." (*Matter of Hughes*, 225 App. Div. 29, citing Domestic Relations Law, § 51; *Winter* v. *Winter*, 191 N. Y. 462; *Kaufman* v. *Kaufman*, 158 App. Div. 892.) " Agreements for separation of husband and wife are valid if made in prospect of an immediate separation, but illegal if they provide for a possible separation in the future ". (13 C. J., Contracts, 466.) Further, even if defendant claimed an agreement to make a future separation agreement, that would not be of greater effect. In any event, no provision for the support of the wife was proved.

The husband does admit that he left his wife on June 9, 1943, with the intention not to return, that he went to Nevada, attempted to establish a domicile, instituted and completed the action which he deemed necessary to obtain a divorce from plaintiff; that on September 14, 1943, the day he received the divorce decree, he married Genevieve O. Edlund, the codefendant in the first action, and on the following day they left Reno and returned to this State.

Between June 9th and mid-September, the husband, through an attorney at Cortland, N. Y., forwarded to the plaintiff a check for $30 every two weeks and paid the rent of their apartment. Since then nothing has been paid by the husband for the support of the plaintiff.

The defendant husband abandoned the plaintiff and has refused and neglected to support her.

The court must now pass upon the affirmative defense, i.e., the divorce obtained by the husband in Reno. The plaintiff attacks it on several points: the *bona fides* of the husband's domicile in Nevada, the service of the process, the failure of the decree to show the proper basis of jurisdiction, and that

the defendants did not prove the court was one of general jurisdiction. The plaintiff herein was served as defendant in the Nevada action by constructive service. She did not appear in that action.

The defendant husband was in the State of Nevada from June 18th to September 15th. He testified that while there he opened a bank account, rested two weeks and then sought employment and actually worked eight or nine days, he paid $10 for office space, he applied for a Nevada license as certified public accountant (which he was in New York) and paid a $25 fee. The codefendant testified that they paid a deposit on an apartment before the marriage, which they did not occupy.

It also appears that Genevieve O. Edlund had valuable interests in Cortland and Dryden and the vicinity. For many years and up to the trial she had been actively engaged as a corporate officer in a large machinery company which employed 200 persons. Since 1941 she has been the president of the corporation. Her father established the business in 1918 and served as president until 1931. Her brother was president until 1940. In 1941 she received a bonus of $7,500 from the corporation. In that year she used that amount for the purchase and operation of a dairy farm at Dryden. The purchase price was $9,250, of which $5,500 was paid in cash. The title was taken in the name of the defendant Philip F. Stevralia who made the milk contract and otherwise helped her to operate it. Her means were sufficient to allow her to operate the farm at an annual loss of about $3,000. The farm was conveyed by Stevralia to Miss Edlund before he left for Reno. Since the defendants returned from Reno they have lived on the farm.

She left for the west on August 28, 1943, and met Stevralia at Reno early in September. She went to California and returned to Reno. Although they admittedly had been in love for several years, they assert they had no intention of getting married until about September 9, 1943, at Reno, when he suddenly asked her to marry him and she accepted. She testified that she had no intention of remaining in the west. She had single railroad accommodations to return on September 7th and did not intend to give up her position in New York when she started for Reno. Hence, they contend, it was necessary for them to return to New York to wind up their affairs before they would return to Nevada to resume their residence there. The illness of his father was also given as a reason for his return to this State. Further, they claim they have been detained here by the necessity of defending these two actions instituted by the plaintiff.

The foregoing facts and circumstances do not convince the court that Philip F. Stevralia in good faith established a domicile in Nevada. However, there are other circumstances which help to resolve any doubt against him. When he left his wife on June 9th he told her he would be back in about a week. He changed his address from Brooklyn to Utica with his draft board and, for mail purposes, with his employer and his son. He claimed he resigned from his position in June before leaving for Reno but was entitled to vacation rights until September 1st. However, a member (now partner) of the employer firm testified that Stevralia was on a leave of absence because of illness, until October 1, 1943, that he was paid semimonthly, that he was expected to return on October 1st, that his services were terminated during September, 1943, as of August 31, 1943, when the firm learned that he had opened an office for the practice of public accounting at Cortland, N. Y. He admitted opening such an office. While in Reno, his name was not placed on the office door, no application was made for a telephone listing, he had no stationery printed and he did not accept an offer of permanent employment which he received. He left Reno with his bride the day after their marriage, which took place the day the divorce decree was granted.

Before a court of the State of Nevada may validly determine the marital status of a former resident of the State of New York, it must have jurisdiction of that resident. This would appear to be academic. To bring an action within the jurisdiction of such a Nevada court, '' plaintiff shall have resided six weeks in the state before suit be brought '' (Nevada Compiled Laws, § 9460). Such residence of six weeks must be substantial and permanent. It must be residence '' characterized by the physical presence of the person as well as by his or her intent to make the place a home '' (*Latterner* v. *Latterner,* 51 Nev. 285, 290; see, also, *Lamb* v. *Lamb,* 57 Nev. 421). It would appear that '' residence '' in the above statute is synonymous with '' domicile '' which, under similar statutes, is the law of the State of New York. '' Before a place of abode will be considered a person's ' domicile,' the person must actually reside there with the fixed intention of making it his permanent home '' (*Pignatelli* v. *Pignatelli,* 169 Misc. 534, 536). There are two factors — residence and intention. (*Gould* v. *Gould,* 235 N. Y. 14; *Matter of Newcomb,* 192 N. Y. 238.)

It is undisputed that before the defendant Stevralia left New York for Reno he was domiciled in the State of New York. '' A domicile having been established, whether of origin or

choice, it continues until a new domicile is acquired. The acquisition of a new domicile involves the present and definite purpose to abandon the old and take up the new place * * *.'' (*Pignatelli* v. *Pignatelli,* 169 Misc. 534, 537, *supra;* see, also, *Matter of Johnson,* 259 App. Div. 290, affd. 284 N. Y. 733.)

The court finds that Philip F. Stevralia did not leave New York with the intention of establishing a permanent residence or a new domicile in Nevada or at any other definite place. He did not, in fact, establish a new domicile. New York continued to be the State of his domicile. While he may have been physically within Nevada for six weeks before he started his action, he was there for the sole purpose of obtaining a divorce. Since he was not a bona fide resident of the State of Nevada, the Nevada court was without jurisdiction to grant him a decree of divorce. (*Reese* v. *Reese,* 179 Misc. 665.)

'' The policy enunciated in *Lefferts* v. *Lefferts* (263 N. Y. 131), requires the courts of this State to pass upon the *bona fides* of the residence of divorcees. That policy is not impaired by the decision in the *Williams* case [*Williams* v. *North Carolina,* 317 U. S. 287], which expressly reserved the question whether the courts of one State might refuse to recognize the findings of the courts of another State as to domicile. All that the majority purported to do in the *Williams* case was to overrule *Haddock* v. *Haddock* (201 U. S. 562), and to remove from the question of full faith and credit consideration of the subsidiary question whether the person who had removed from the matrimonial domicile had wrongfully done so. The Supreme Court of the United States, in the *Williams* case, did not eliminate domicile as a foundation for jurisdiction.'' (*Matter of Bingham,* 265 App. Div. 463, 466, motion for leave to appeal denied 290 N. Y. 929.)

More recently the Court of Appeals stated: '' In the case of *Lefferts* v. *Lefferts* (263 N. Y. 131) this court applied the rule then firmly established that the validity of a Nevada decree of divorce granted without personal service of the defendant may be *impeached by proof* that the plaintiff was not domiciled in Nevada; and that full faith and credit might be denied to a foreign decree purporting to adjudicate the marital status of a plaintiff who, it is shown, was not domiciled in the State of the forum, and a defendant who resides in New York and who was not personally served with process and did not appear in the action.'' (*Matter of Holmes,* 291 N. Y. 261, 272.)

Commenting on the *Williams* case, almost a year ago, Professor Kane of Fordham University Law School wrote, '' In New

York State in a brief three months' period we have a ' new cluster ' of cases in which the Courts have insisted on maintaining the divorce policy of the State, mainly by questioning the bona fides of the domicile in the divorce State.'' (12 Fordham Law Rev. 153.) The cluster has grown larger. Our courts have consistently held that the *Williams* case has not changed the law of this State as enunciated in *Lefferts* v. *Lefferts* (263 N. Y. 131, *supra*) and *Bell* v. *Bell* (181 U. S. 175). (" *Standish* " v. " *Standish* ", 179 Misc. 564; *McCarthy* v. *McCarthy*, 179 Misc. 623; *McKee* v. *McKee*, 179 Misc. 617, affd. 266 App. Div. 992; *Matter of Lindgren*, 181 Misc. 166, affd. 267 App. Div. 775; *Meyers* v. *Meyers*, 179 Misc. 680; *Fondiller* v. *Fondiller*, 179 Misc. 1086, affd. 266 App. Div. 1000; *Reese* v. *Reese*, 179 Misc. 665, *supra; Ammermuller* v. *Ammermuller*, 181 Misc. 98; *Quayle* v. *Quayle*, N. Y. L. J., Feb. 2, 1944, p. 439, col. 2.)

The question in the instant case was squarely met in the three cases last cited. In each of them, matrimonial actions, the defense of a foreign divorce was before the court.

A divorce obtained in another State against a resident of this State, who was not served in that State and did not appear in that action, is not a valid defense in a matrimonial action in this State, where it is shown that the foreign court did not have jurisdiction because the plaintiff there was not domiciled in that State as required by its statute.

It is not necessary to pass upon the other objections to the Nevada decree.

Judgment for the plaintiff in the separation action. Alimony is fixed at $30 per week payable from December 7, 1943, the first day of the trial. Plaintiff is also awarded counsel fee of $250 and costs. Settle judgment accordingly on notice.

Since a necessary conclusion in the separation action must be that the Reno divorce is not valid, it now follows that the marriage between the defendants in the other action is a nullity. Submit judgment for plaintiff with costs.